UNITED STATES of America, Appellee,

v.

Maurice ISABEL, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Ronald DESCOTEAUX, a/k/a Piece
of Cake, a/k/a Wacky Ron,
Defendant, Appellant.

Nos. 90–1839, 90–1860.

United States Court of Appeals,
First Circuit.

Heard Jan. 8, 1991.

Decided Sept. 10, 1991.

Carmine W. DiAdamo, for defendant, appellant Maurice Isabel.

Stanley W. Norkunas, for defendant, appellant Ronald Descoteaux.

Jean B. Weld, Asst. U.S. Atty., with whom Jeffrey R. Howard, U.S. Atty., was on brief, for appellee.

Before TORRUELLA, SELYA and CYR, Circuit Judges.

CYR, Circuit Judge.

Maurice Isabel and Ronald Descoteaux appeal their convictions under 18 U.S.C. §§ 371 and 1956(a)(1)(B)(i), for conspiracy to launder proceeds from cocaine trafficking. Appellants challenge: (i) the amendment of the indictment at the close of the evidence; (ii) the admission of certain testimony at trial; (iii) the sufficiency of the evidence; and (iv) the decision not to depart downward from the guideline sentencing range. We affirm.

I

BACKGROUND

A. *Procedural History*

On January 31, 1990, the grand jury returned a seven count indictment charging Isabel and Descoteaux with conspiring to

file false federal tax documents (count I, ¶¶ 1–3), and with conspiring

[t]o conduct and attempt to conduct financial transactions, in order to "launder" proceeds of specified unlawful activities, to-wit: specifically (a) dealing in narcotic and dangerous drugs, and (b) gambling, in the approximate total amount of $98,225, in order to conceal and disguise the true nature, location, and source of the drug trafficking and gambling proceeds, in violation of 18 U.S.C. § 1956(a)(1)(A).

(Count I, ¶ 4). The indictment further charged Isabel with the substantive crime of money laundering (counts II–VI), and Descoteaux with conspiracy to distribute cocaine (count VII).[1]

A jury trial was commenced on April 17, 1990. At the close of all the evidence, the court allowed the government to amend the indictment to correct a miscitation in count I, ¶ 4. Appellants were convicted of conspiracy to file false federal tax documents and conspiracy to launder cocaine trafficking proceeds, but were acquitted on all remaining counts.

B. *Facts*

The testimonial and documentary evidence adduced at trial tells the tale. Maurice Isabel owned M.G. Masonry, a small, legitimate business engaged in brick and block work.[2] In 1983 Jean M. Lemieux, a prominent local cocaine dealer, was warned by his supplier that, "I should pay taxes because they're going to catch up with me, because, you know, I was buying cars and all this stuff. So I had to show that I was making money somewhere, and that's how I made it." Lemieux's supplier recommended that Lemieux contact Maurice Isabel. After Isabel and Lemieux met, Isabel agreed to put Lemieux on the M.G. Masonry payroll.[3] In 1984, and during the period 1986 through 1988, Lemieux purportedly

---

**1.** The government voluntarily dismissed counts II, III and IV, prior to the commencement of its case in chief.

**2.** Isabel also did business under the name M.G. Cement Work. We refer to "M.G. Masonry" throughout.

**3.** In Lemieux's words, "I asked him [Isabel] ... if he could write out some check for me and so I could pay taxes and Maurice [Isabel] says it was okay. He said he would do it."

"earned" a total of $85,396 in gross income from M.G. Masonry. Lemieux actually worked only two weeks for M.G. Masonry during the entire four-year period. (After he was indicted on drug charges in Miami, Lemieux decided: "I better start working to make it look good, and I worked for two weeks and I quit.").[4]

Lemieux's covert arrangement with Isabel was uncomplicated. He tendered cash, instead of services, in exchange for the putative M.G. Masonry wages. Lemieux informed Isabel that he "need[ed] at least $700 a week." Lemieux would pay Isabel cash in the amount of the supposed gross wage, and Isabel would give Lemieux a check drawn on the M.G. Masonry account in the amount of the net wage calculated by Isabel, applying the difference to income tax, social security, and workers' compensation payments. Isabel supplied Lemieux with W–2 forms purporting to reflect Lemieux's earnings. Thus, Lemieux, in his own words, received "legal money, so I was able to use it." Isabel garnered phony business expense write-offs with which to reduce his taxable business income.

During their extended business relationship, Lemieux had no legitimate source of income, and never suggested otherwise to Isabel. When asked "[i]s there anything other than drug dealing, Mr. Lemieux, that you've ever told Isabel that you did for a living during that period of time [1982 to date]," Lemieux responded, "No, I told him I was doing drugs." When Lemieux and Isabel conducted their first transaction— the $19,200 "sale" of masonry supplies in 1983—Lemieux informed Isabel that the money came from selling drugs. Later on, Lemieux told Isabel that appellant Descoteaux sold drugs for him.[5] Isabel was aware also of Lemieux's arrest on drug charges in 1987.

The government elicited additional testimony from one Joe Scott, a general contractor for whom Isabel had done masonry work over a period of years. Scott testified that in May 1989, after becoming aware of what he believed to be then-pending money laundering charges against Isabel, he asked Isabel, " 'Did you launder any money?' " Scott testified that Isabel responded "that he did launder the money."

The evidence on appellant Descoteaux's relationship with Isabel was not as abundant. Descoteaux was on the M.G. Masonry payroll for two years, "earning" a total of $11,000 in gross income. During that time, he was not known to have any source of income other than cocaine trafficking. Lemieux was responsible for bringing Descoteaux and Isabel together, having suggested to Descoteaux that he contact Isabel to "get a check like I get because, you know, it don't look good.... He needs to report the taxes every year.... So I told him to go down and see Maurice Isabel." Lemieux later asked Isabel whether Descoteaux had been to see him, and Isabel responded, "Yes ... I took care of it." Lemieux further testified that Isabel said: "Ronnie [Descoteaux] came down and pick (sic) up the check," and that Isabel "was giving Ronnie some checks."

## II

## DISCUSSION

### A. *Miscitation in Indictment*

■ The district court allowed the government to amend the statutory citation in count I, ¶ 4, to refer to 18 U.S.C. § 1956(a)(1)(B) instead of 18 U.S.C. § 1956(a)(1)(A), and determined that the miscitation in the original indictment was nonprejudicial.[6] Federal Rule of Criminal

---

4. Lemieux additionally had received a check for $19,200 from M.G. Masonry in December 1983, after tendering $19,200 in cash to Isabel. Isabel gave Lemieux a Federal Income Tax form 1099, purporting to verify payment of $19,200 to Lemieux for masonry supplies.

5. Near the end of 1984, Descoteaux began buying, on average, between one half and one kilogram of cocaine monthly from Lemieux.

6. The Money Laundering Control Act of 1986, Pub.L. No. 99–570, title I(H), 100 Stat. 3207, 3207–18 (codified as amended at 18 U.S.C. §§ 1956, 1957) was signed into law on October 27, 1986. The italicized portions set out below were added to the statute on November 18, 1988 by Pub.L. No. 100–690, § 6471, 102 Stat. 4181, 4378.

Procedure 7(c) provides in relevant part that:

(1) The indictment or information shall state for each count the official or customary citation of the statute, rule, regulation or other provision of law which the defendant is alleged therein to have violated

. . . .

(3) **Harmless Error.** Error in the citation or its omission shall not be ground for dismissal of the indictment or information or for reversal of a conviction if the error or omission did not mislead the defendant to the defendant's prejudice.

Appellants argue that the miscitation in the original indictment, and its belated amendment immediately before trial, prejudiced their defense. According to appellants, until the time the amendment was allowed they had proceeded on the understanding that the government was attempting, mistakenly, to charge them under section 1956(a)(1)(A)(ii), which was not in effect when their payroll check transactions were conducted.[7] Their theory is not borne out by the record.

First, count I, paragraph 4, plainly alleges a violation of 18 U.S.C. § 1956(a)(1)(B)(i) by charging a conspiracy to "launder" drug trafficking and gambling proceeds "in order to conceal and disguise the true nature, location, and source of the drug trafficking and gambling proceeds." The language of the indictment closely tracks section 1956(a)(1)(B)(i), which criminalizes the knowing conduct of a financial transaction designed to "conceal or disguise the na-

ture, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." Section 1956(a)(1)(A)(ii), on the other hand, criminalizes financial transactions undertaken with intent to engage in conduct violative of I.R.C. §§ 7201 and 7206, which in turn criminalize attempted tax evasion and the filing of false tax documents. As the original indictment was drafted in the operative language of section 1956(a)(1)(B)(i), which bears little resemblance to section 1956(a)(1)(A), we find that the citation to section 1956(a)(1)(A) was a patent mistake and that the original indictment placed appellants on reasonable notice that they were being charged with the money laundering conspiracy *expressly alleged* in the text of the indictment. *See United States v. Morrison,* 531 F.2d 1089, 1094 (1st Cir.) (defendant not prejudiced by government's failure to cite to correct statute where text of indictment provided adequate notice of charge), *cert. denied,* 429 U.S. 837, 97 S.Ct. 104, 50 L.Ed.2d 103 (1976); *United States v. Kennington,* 650 F.2d 544, 546 (5th Cir. Unit B 1981) (per curiam) (same); *United States v. Stinson,* 594 F.2d 982, 984–85 (4th Cir.1979) (no prejudice where indictment cited 26 U.S.C. § 5861(e) but used "precise language" of § 5861(d)); *see also United States v. Mena,* 933 F.2d 19, 22 n. 2 (1st Cir.1991).

Furthermore, whatever initial confusion might have been created by the obvious inconsistency between the text of the indictment and the miscitation to section 1956(a)(1)(A)[8] would have been dissipated

---

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)*(i)* with the intent to promote the carrying on of specified unlawful activity; or

*(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or*

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law, shall be sentenced. . . .

18 U.S.C. § 1956(a)(1).

**7.** *See supra* note 6. Section 1956(a)(1)(A)(ii) covers financial transactions carried out with intent to violate §§ 7201 or 7206 of the Internal Revenue Code ("I.R.C.") of 1986. Appellants contend that since the first three paragraphs of count I charged them with conspiring to violate I.R.C. §§ 7206(1) and (2), they assumed that count I, ¶ 4, must have been written with 18 U.S.C. § 1956(a)(1)(A)(ii) in mind as well.

**8.** Any such hypothetical confusion could explain the government's failure to urge waiver under

entirely and immediately upon presentation of the government's opening statement, if not sooner:

> This trial involves drug dealers, gamblers and money launderers. *We're not talking about an attempt by Mr. Isabel and Mr. Descoteaux to cheat on their taxes.* Okay. The United States Attorney prosecutes those cases as well. But this is not a tax evasion case. These people, ladies and gentlemen, are charged with *conspiring together and with other drug dealers and gamblers to launder money and to make it look like that money was legitimate income, legal income.* The way they did it was the drug dealers ... would give their money to Mr. Isabel. Mr. Descoteaux was one of the drug dealers. Mr. Descoteaux gave his money, as the other drug dealers did, to Mr. Isabel, who had a little business that he owned.... The drug dealers and the gambler would give their cash, their dirty money, to Mr. Isabel.... In return for the money, which could have been anywhere from 500 to 700, sometimes $1,000 in cash on a fairly regular basis, in return for that money, that money bought the drug dealers and the gambler a paycheck, a paycheck drawn on M.G. Masonry and signed by Mr. Isabel. So, Mr. Isabel made it look

like the drug dealers and the gambler worked for him.

(Emphasis added).

Similarly, appellants have identified no prejudice attributable to the miscitation. Nowhere in their briefs, nor even at oral argument, have appellants suggested that there were defense stratagems which would or would not have been employed but for the miscitation.[9] *Cf. United States v. Van West,* 455 F.2d 958, 959 (1st Cir. 1972) (per curiam) (no prejudice where "[n]ot only was it apparent on the face of the indictment" that citation was erroneous, but cross-examination of government's witnesses revealed defendant's awareness of correct charge). We are unpersuaded that appellants were occasioned significant prejudice either by the original miscitation or by the timing of the amendment.

## B. *Evidentiary Rulings*

Appellants challenge the admission into evidence of alleged coconspirator statements, *see* Fed.R.Evid. 801(d)(2)(E), and "prior bad acts" evidence, *see* Fed.R.Evid. 404(b).

### 1. Coconspirator Statements

Appellants contend that the district court erroneously refused to conduct a pretrial hearing on the admissibility of certain alleged coconspirator statements.[10]

---

Fed.R.Crim.P. 12(b)(2) ("The following must be raised prior to trial ... (2) Defenses and objections based on defects in the indictment....").

9. Isabel does advert to a hearing before the district court at which he asserted that if he had understood the charges against him, he would have cross-examined Lemieux to demonstrate that the sums allegedly laundered were relatively insignificant compared with Lemieux's cocaine trafficking income. In fact, Isabel's actual cross-examination of Lemieux at trial plainly evinced Isabel's awareness of the exact nature of the money laundering charge.

After eliciting an admission that Lemieux was making $200,000 to $235,000 monthly from drug dealing, Isabel attempted to induce Lemieux to concede that the relatively small amounts of cash Lemieux was passing through M.G. Masonry were so insignificant as to be inconsistent with a purpose to launder money.

Q. You had no need, with $200,000 a month coming in, to make $700 look legitimate; did you?

A. Yes, I had the need, because I had to show that I was making money somewhere. You can't go out and buy a house with cash money.

10. Under *United States v. Petrozziello,* 548 F.2d 20 (1st Cir.1977), the out-of-court declaration of an alleged coconspirator may be admitted into evidence under Fed.R.Evid. 801(d)(2)(E) only if "it is more likely than not that the declarant and *the defendant were members of a conspiracy* when the hearsay statement was made, and that the statement was made in furtherance of the conspiracy...." *Id.* at 23. The court may admit the statement provisionally, subject to its final *Petrozziello* determination at the close of all the evidence. If the court ultimately countermands its provisional ruling, it may give a cautionary jury instruction or, on motion, declare a mistrial if an instruction would not prevent or cure the prejudice resulting from its provisional admission of the hearsay. *See United States v. Ciampaglia,* 628 F.2d 632, 638 (1st Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980).

Their contention is simply incorrect. The district court may, but need not, make a pretrial determination as to the provisional admissibility of the proffered statements. *See United States v. Medina*, 761 F.2d 12, 17 (1st Cir.1985). Our decision in *United States v. Bernal*, 884 F.2d 1518, 1522–23 (1st Cir.1989), is not to the contrary. *Bernal* merely determined that it was not improper for the district court to make a pretrial ruling on the provisional admissibility of the putative coconspirator statements. *Compare United States v. Angiulo*, 897 F.2d 1169, 1201–02 (1st Cir.) (statements provisionally admitted during course of trial; *Petrozziello* ruling at close of evidence), *cert. denied*, —— U.S. ——, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990).

■ Appellants have not identified the challenged hearsay, except as "the statements of Misters Lavoie, Lemieux, Pinet and Riberty," nor do they describe their purport, beyond suggesting that the statements tended to establish the existence of a conspiracy.[11] *See Bourjaily v. United States*, 483 U.S. 171, 178, 107 S.Ct. 2775, 2780, 97 L.Ed.2d 144 (1987) (coconspirator statements may be considered in making rule 801(d)(2)(E) determination as to whether conspiracy existed). We cannot conduct effective appellate review of an evidentiary ruling admitting coconspirator statements under Evidence Rule 801(d)(2)(E) absent reference to the challenged statements, *cf. Engdahl v. Dep't of Navy*, 900 F.2d 1572, 1576 (Fed.Cir.1990) (in absence of factual predicate, legal argument need not be reached), nor can prejudicial error be presumed without record foundation.[12] Finally, there was abundant, unchallenged evidence that appellants conspired with one another, and with Lemieux, to launder drug trafficking proceeds. "Thus, we can say 'with fair assurance[,]'" based on a careful examination of the record, that any assumedly erroneous ruling on the admission of unidentified coconspirator statements did not "'substantially' sway the judgment of the jury" on the existence of a conspiracy between appellants or among appellants and Lemieux. *See United States v. Shenker*, 933 F.2d 61, 64 (1st Cir.1991) (quoting *United States v. Hernandez–Bermudez*, 857 F.2d 50, 53 (1st Cir.1988) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946))).

## 2. Prior Bad Acts

■ Appellant Isabel claims unfair prejudice from the admission of the testimony of John Lavoie, a bookmaker, who stated that he was engaged in a cash-for-paycheck scheme with Isabel from 1983 to 1986. Isabel argues that any probative value in Lavoie's testimony was substantially outweighed by the danger of jury confusion and unfair prejudice, *see* Fed.R.Evid. 403 (evidence excludable if probative value is "substantially outweighed," *inter alia*, by "danger of unfair prejudice" or "confusion of issues"), since the Lavoie–Isabel gambling-related conspiracy was distinct from the Isabel–Lemieux–Descoteaux drug-related conspiracy.

The admissibility of "other acts" evidence depends on a two-part analysis. *United States v. Rodriguez–Cardona*, 924 F.2d 1148, 1150 (1st Cir.1991); *United States v. Oppon*, 863 F.2d 141, 146

11. Appellants do state that the court "erred when it allowed John Lavoie to testify as to the purpose of his agreement with Isabel," but they make no "reference ... to the pages of ... the transcript at which the evidence was identified, offered, and received...." Fed.R.App.P. (otherwise "FRAP") 28(e), and we have been unable to find any hearsay testimony relating to the purpose of Lavoie's agreement with Isabel.

12. In these circumstances appellants must be deemed to have waived their 801(d)(2)(E) claim, as they have failed to comply with the FRAP 28(e) requirement that reference be made to the transcript pages containing the evidence whose admissibility is controverted on appeal. *See United States v. Rewald*, 889 F.2d 836, 861 n. 24 (9th Cir.1989) (declining to consider merits of allegations of perjured testimony made without benefit of citation to record) (collecting cases), *cert. denied*, —— U.S. ——, 111 S.Ct. 64, 112 L.Ed.2d 39 (1980). Moreover, appellants do not describe the challenged evidence sufficiently to enable us to search the extensive trial record with reasonable facility. *See Engdahl*, 900 F.2d at 1576 (declining to consider argument absent FRAP 28(e) record citations, where, "[a]dditionally," the court was unable to find evidence in record to support appellant's position).

(1st Cir.1988). First, "other acts" evidence must be excluded if "it is relevant *only* because it shows bad character (*i.e.*, the proposed logical inference includes character as a *necessary* link)." *United States v. Ferrer–Cruz*, 899 F.2d 135, 137 (1st Cir.1990) (emphasis in original); *see also* Fed.R.Evid. 404(b). Second, the district court must weigh the probative value of the "other acts" evidence against any unfair prejudice to the defendant, *Rodriguez–Cardona*, 924 F.2d at 1150; *Oppon*, 863 F.2d at 146; *see also* Fed.R.Evid. 403; and it is only when the risk of unfair prejudice "substantially" outweighs its probative value that the evidence is to be excluded, *Ferrer–Cruz*, 899 F.2d at 138.

*Shenker*, 933 F.2d at 63.

Isabel failed to assert a contemporaneous rule 403 or rule 404(b) objection to the introduction of the Lavoie testimony. We therefore review only for plain error, *see* Fed.R.Evid. 103(a)(1); *United States v. Moore*, 923 F.2d 910, 915 (1st Cir.1991); and we find no error whatever. In fact, any risk of unfair prejudice to Isabel was insubstantial in comparison with the special probativeness of the evidence on the central issues raised by Isabel's defense; *viz.*, Isabel's "motive ... intent ... plan, knowledge ... [and] absence of mistake or accident." Fed.R.Evid. 404(b).

▮▮▮ Like Isabel, appellant Descoteaux failed to assert a contemporaneous objection to the Lavoie testimony. Moreover, Descoteaux presents no discrete argument regarding Lavoie's testimony but merely adopts by reference the arguments in Isabel's brief. *See* FRAP 28(i). We recently stated that "[a]doption by reference ... cannot occur in a vacuum; to be meaningful, the arguments adopted must be readily transferrable from the proponent's case to the adopter's case." *United States v. David*, 940 F.2d 722 at 737 (1st Cir.1991) (404(b) evidence). Where the adopter's "situation regarding the extrinsic act evidence is materially different than that of the [proponent] ... [the adopter's] incorporation by reference of the [proponent's] arguments does not adequately develop or

preserve the issue with respect to his own appeal." *Id.*

Even assuming some incidental prejudice to Isabel based on the theory that the Lavoie testimony might have portrayed Isabel as a long-time money launderer, and perhaps even confused the jury as to which of Isabel's paycheck schemes allegedly constituted a criminal offense under the money laundering statute, the Lavoie–Isabel paycheck scheme involved no prior bad acts relating in any way to Descoteaux. Thus, any potential prejudice to Descoteaux from the admission of Lavoie's testimony would have been of an entirely different nature than any prejudice to Isabel. Accordingly, Descoteaux has not adequately preserved this claim on appeal. *Id.* Finally, Descoteaux in any event lacked standing to raise a rule 404(b) challenge to the testimony on the Lavoie–Isabel paycheck scheme. *See id.* at 736 (404(b) objection may be raised only by person whose prior bad acts are to be introduced).

### C. *Sufficiency of Evidence*

Appellants contend that there was insufficient evidence to support their convictions for conspiring to launder cocaine trafficking proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

"The gist of conspiracy is an agreement to disobey or to disregard the law," *United States v. Drougas*, 748 F.2d 8, 15 (1st Cir.1984), which the government may prove by direct and circumstantial evidence, *United States v. Rivera–Santiago*, 872 F.2d 1073, 1079 (1st Cir.1989). The evidence must establish that the defendants intended to agree and that they intended to commit the substantive criminal offense which was the object of their unlawful agreement. *Id.; accord United States v. Flaherty*, 668 F.2d 566, 580 (1st Cir.1981). Due to the clandestine nature of criminal conspiracies, the law recognizes that the illegal agreement may be either "express or tacit" and that a "common purpose and plan may be inferred from a development and collocation of circumstances." *Rivera–Santiago*, 872 F.2d at 1079 (quoting *Glasser v.*

*United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)).

*United States v. Sanchez,* 917 F.2d 607, 610 (1st Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991). Thus, the evidence must have been sufficient to establish, beyond a reasonable doubt, that each appellant conspired to violate 18 U.S.C. § 1956(a)(1)(B)(i).

■ Section 1956(a)(1)(B)(i) makes it a crime for any person to conduct a financial transaction involving actual proceeds of specified unlawful activity, knowing (i) that the proceeds derive from *some form* of unlawful activity *and* (ii) that the financial transaction was designed to conceal or disguise the proceeds of specified unlawful activity. *See* 18 U.S.C. § 1956(a)(1)(B)(i).[13]

We evaluate the evidence against each appellant in turn, under the following criteria:

> Without weighing witness credibility, *United States v. Serrano,* 870 F.2d 1, 5 (1st Cir.1989) (citing *Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978)), we assess the sufficiency of the evidence, including all reasonable inferences, in the light most favorable to the government, *United States v. McNatt,* 813 F.2d 499, 502 (1st Cir.1987), with a view to whether a rational jury could have found the defendant guilty beyond a reasonable doubt.

*Sanchez,* 917 F.2d at 610–11. Thus viewed, there was sufficient evidence to support the conspiracy convictions against Isabel and Descoteaux.

**1. Maurice Isabel**

(a) *"Financial Transaction"*

■ A "financial transaction" is defined in relevant part as "a transaction ... involving one or more monetary instruments." 18 U.S.C. § 1956(c)(4). "[M]onetary instruments" include personal checks. *Id.* § 1956(c)(5). Thus, Isabel's payroll check scheme involved "monetary instruments" and constituted a series of "financial transactions." *See United States v. Jackson,* 935 F.2d 832, 841 (7th Cir.1991) ("Writing a check, whether for cash or to a vendor who has provided services, falls within the definition of a 'financial transaction' ").

■ Isabel contends, however, that beginning in 1987, the year section 1956 went into effect,[14] Lemieux tendered Isabel only enough cash to cover the requisite income tax, social security and workers' compensation insurance "deductions" from a gross salary of the amount Lemieux supposedly was earning. Isabel then would write a check to Lemieux in the amount of the net "wages." But rather than depositing the check in his bank account, as had been their previous practice, Lemieux then simply endorsed the check and gave it back to Isabel. Consequently, according to Isabel, Lemieux acquired no laundered money from Isabel after section 1956 went into effect.

We need not address the merits of this claim.[15] Lemieux provided the only direct

---

**13.** Section 1956(a)(1) purposely criminalizes only those financial transactions which involve actual proceeds of *specified* unlawful activity, *see* § 1956(c)(7), conducted or attempted by a person with knowledge that the property involved in the transaction represented proceeds from *any form* of unlawful activity, not necessarily proceeds from an unlawful activity specified in § 1956(c)(7).

> [T]he defendant need not know exactly what crime generated the funds involved in a transaction, only that the funds are the proceeds of some kind of crime that is a felony under Federal or State law. This will eviscerate the defense that a defendant knew the funds came from a crime, but thought the crime involved was a crime not on the list of "specified" crimes in section (c)(7).

S.Rep. No. 433, 99th Cong., 2d Sess. 12 (1986). Thus, under § 1956(a)(1)(B)(i), the defendant need not have known that the *property involved* in the financial transaction represented proceeds of a specified unlawful activity, only that the *financial transaction was designed* to conceal or disguise proceeds of a specified unlawful activity. *See* § 1956(a)(1)(B)(i) & (c)(7).

**14.** All parties assume, without explanation, that section 1956 became effective on January 27, 1987, although it was signed into law on October 27, 1986. For present purposes we accept their assumption.

**15.** We note, however, that even in this scenario a check would have been drawn in exchange for tainted cash whose unlawful source would have

evidence of the details of his financial relationship with Isabel. Lemieux testified on at least two occasions that, beginning in 1987, he endorsed M.G. Masonry checks back over to Isabel; on at least two other occasions, however, he testified that after 1987, he himself cashed the M.G. Masonry checks received from Isabel. The jury was entitled, at the very least, to find that there were post–1987 financial transactions between Isabel and Lemieux identical in design to the pre–1987 payroll check transactions.

### (b) Proceeds of "Specified Unlawful Activity"

Section 1956(a)(1) only criminalizes financial transactions involving the proceeds of an unlawful activity specified in section 1956(c)(7),[16] conducted or attempted by a person *with knowledge* that the proceeds were from "*some form* of unlawful activity," not necessarily one specified in section 1956(c)(7). *See supra* note 13.

■ There was ample evidence that Isabel well knew that the monies he received from Lemieux in exchange for M.G. Masonry payroll checks represented cocaine trafficking proceeds. First, there was evidence that Lemieux had no legitimate source of income, and appellants have pointed to nothing in the record, nor have we discovered anything, to indicate that Isabel had any basis for believing otherwise. Second, Lemieux actually told Isabel that he sold drugs for a living. Third, as far back as 1983 Isabel had been informed by Lemieux that Lemieux's first cash disbursement to Isabel, in the amount of $19,200, had come from selling drugs. Isabel knew that Lemieux was arrested on drug charges in 1987. On a later occasion, Lemieux told Isabel that Descoteaux sold drugs for him. Given

the strength of the evidence that Isabel knew that the monies tendered by Lemieux were drug trafficking proceeds, the jury rationally could have concluded that Isabel intended to conduct financial transactions involving Lemieux's drug proceeds by means of the payroll check scheme. *Cf. United States v. Blackman*, 904 F.2d 1250, 1257 (8th Cir.1990) (evidence that defendant was engaged in drug trafficking, and had no legitimate source of income, was enough to establish unlawful provenance of funds); *United States v. Jackson*, 935 F.2d 832, 840 (7th Cir.1991) (unnecessary to trace funds in order to show they were "proceeds of specified unlawful activity").

### (c) Knowledge of Laundering Design

■ There was ample evidence that Isabel was well aware that the purpose of the payroll check scheme was to conceal the source of Lemieux's drug trafficking proceeds. *See* 18 U.S.C. § 1956(a)(1)(B)(i) & (c)(7). First, the obvious primary effect of the payroll scheme was to convert the drug trafficking proceeds Lemieux would tender to Isabel into what would appear to the outside world to be legitimate income. Second, the telltale circumstantial setting in which Isabel did business with Lemieux, including Isabel's knowledge that Lemieux was a longtime drug dealer, Lemieux's statement to Isabel, "I need at least $700 a week," and Lemieux's explanation that he wanted to get on the payroll so that he could pay taxes, was sufficient to undergird a reasonable finding that Isabel knew that the purpose of the payroll check scheme was to conceal and disguise these drug trafficking proceeds. *Cf. United States v. Massac*, 867 F.2d 174, 177–78 (3d Cir.1989) (evidence that defendant engaged in drug trafficking and used unusual channels to transfer cash overseas, sufficient to

been disguised. Disguise was achieved simply by creating the phony paper trail consisting of the M.G. Masonry check to Lemieux, bearing Lemieux's endorsement, and the related W–2 form.

**16.** Section 1956(c)(7) defines "specified unlawful activity" as including, *inter alia,* "any act or activity constituting an offense listed in section 1961(1) of this title...." 18 U.S.C. § 1956(c)(7)(A). Section 1961(1) ["RICO"] pro-

vides a laundry list of "racketeering activity," which includes "any act ... involving ... dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A). N.H.Rev.Stat.Ann. § 318–B:26(I)(c) authorizes a sentence of imprisonment for up to seven years for selling cocaine in a quantity of less than one-half ounce.

show knowledge that financial transactions were designed to launder drug proceeds).

 Isabel contends that the evidence did not show that by engaging in the payroll check scheme he *intended* to conceal or disguise Lemieux's drug trafficking proceeds. Assuming, without deciding, that section 1956(a)(1)(B)(i) requires proof of intent to conceal or disguise proceeds of specified unlawful activity, *compare supra* p. 1201 (setting out elements of § 1956(a)(1)(B)(i)), Isabel's knowing participation in the payroll check scheme unquestionably demonstrated such intent, as it manifestly facilitated the known purpose of the payroll check scheme; *i.e.*, the concealment of Lemieux's drug trafficking proceeds. *See Direct Sales Co. v. United States*, 319 U.S. 703, 712 & n. 8, 63 S.Ct. 1265, 1269 & n. 8, 87 L.Ed. 1674 (1943) (knowledge of coconspirator's unlawful objective, combined with defendant's active role in conspiracy, sufficient to prove intent to further unlawful objective; in some circumstances involving isolated or casual transactions not amounting to a course of business, mere evidence of knowledge of alleged coconspirator's unlawful objective will not by itself support a finding of intent on the part of the defendant to achieve same unlawful objective).

 Moreover, Isabel had a financial motive for laundering Lemieux's drug monies. Isabel utilized the ostensible business expenses represented by the payroll check disbursements to reduce his business tax liability, *see Direct Sales*, 319 U.S. at 713, 63 S.Ct. at 1270 (profit to be derived from participation constitutes stake in venture). Although evidence of a financial stake in the venture is not essential to show that the defendant intended to facilitate the unlawful objective of the conspiracy, *id.*, it is plainly probative of such an intent. *See United States v. Aponte–Suarez*, 905 F.2d 483, 491 (1st Cir.) (stake in outcome of conspiracy), *cert. denied*, ——

U.S. ——, 111 S.Ct. 531, 112 L.Ed.2d 541 (1990), *and* —— U.S. ——, 111 S.Ct. 975, 112 L.Ed.2d 1061 (1991); *United States v. Garcia–Rosa*, 876 F.2d 209, 216 (1st Cir. 1989) (same), *vacated on other grounds*, —— U.S. ——, 111 S.Ct. 377, 112 L.Ed.2d 391 (1990); *aff'd*, 930 F.2d 951 (1st Cir.1991). Nor does the evidence that Isabel may have had other motives for entering into the payroll check scheme, such as tax evasion, detract from the probativeness of Isabel's knowledge of Lemieux's money laundering aims on the issue of Isabel's willingness to facilitate their achievement. Section 1956(a)(1)(B)(i) merely requires, *inter alia*, that the defendant have known that the transaction was "designed in whole *or in part*" to conceal or disguise the proceeds of specified unlawful activity. *Cf. United States v. Cambara*, 902 F.2d 144, 147 (1st Cir.1990) (commission of substantive offense which was object of alleged conspiracy need not have been "sole motive, or even the primary motive, of the coconspirators"). In sum, even without considering Isabel's admission to Scott that he "laundered the money," there was overwhelming evidence that Isabel knowingly agreed to conduct "financial transactions" designed to disguise the source of actual proceeds from Lemieux's cocaine trafficking.[17]

### 2. Ronald Descoteaux

 The government adduced enough evidence to enable a reasonable jury finding that Descoteaux was a cocaine dealer sent by his supplier, Lemieux, to launder drug money through Isabel.[18] Lemieux testified that he told Descoteaux to contact Isabel to "get a check like I get." After he was asked whether Descoteaux had been to see him, Isabel told Lemieux that he had "taken care of it" and "was giving Ronnie some checks." During

---

**17.** There is no merit whatever in Isabel's conclusory argument that his agreement with Lemieux terminated before section 1956 became effective.

**18.** At oral argument, Descoteaux stated that he challenges his conviction for conspiracy to violate I.R.C. § 7206 as well. Descoteaux's brief challenges only his conviction for conspiracy to

violate 18 U.S.C. § 1956(a)(1)(B). Having failed to articulate any argument in support of a challenge to his conviction for conspiring to violate § 7206, Descoteaux has failed to preserve any such claim. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

a two-year period, while Descoteaux had no source of income except drug trafficking, Isabel issued $11,000 in payroll checks to Descoteaux. There was no evidence that Descoteaux performed services for Isabel, or gave Isabel any other consideration for the payroll checks. The evidence was sufficient, at the very least, to show that Descoteaux knew that the payroll checks received from Isabel were designed to conceal or disguise Descoteaux's unlawful cocaine trafficking proceeds, which was the very reason Descoteaux went to see Isabel in the first place at the behest of Lemieux. *See Massac*, 867 F.2d at 177–78 (evidence that defendant was drug trafficker and used unusual channels to transfer cash, sufficient to show knowledge of laundering design of transfers). *A fortiori*, the jury reasonably could have concluded that Descoteaux knew that these check transactions involved proceeds of some form of unlawful activity.

There was sufficient evidence as well that Descoteaux in fact entered into the payroll check scheme; *i.e.*, that he and Isabel actually conducted one or more financial transactions involving proceeds of specified unlawful activity. The direct evidence took the form of Isabel's admission to Lemieux, that Isabel had "taken care of it" and "was giving Ronnie [Descoteaux] some checks," and the $11,000 in M.G. Masonry checks Isabel made out to Descoteaux. Considered in the context of the circumstantial evidence that Descoteaux

had no legitimate source of income, the evidence was sufficient to support a reasonable inference that Descoteaux, having gone to Isabel to arrange for the laundering of drug trafficking proceeds, as Isabel was doing for Lemieux, managed to accomplish his purpose with Isabel, at least to the extent indicated by the $11,000 in checks for which no other plausible explanation can be gleaned from the record.[19]

### D. *Sentencing Guidelines*

 Appellants' last claim is that the district court mistakenly concluded that the Sentencing Guidelines divest the district court of all sentencing discretion.[20] According to appellants, the quoted statement demonstrates that the district court was unaware that it possessed any discretion to depart below the guideline sentencing range, even if there were mitigating circumstances not adequately considered by the Sentencing Commission. *See* 18 U.S.C. § 3553(b). Appellants mischaracterize the purport of the district court statement.

First, the court never suggested that it had *no* sentencing discretion under the guidelines, only that it had very limited discretion. Second, after considering appellants' requests for downward departures, the court concluded:

I don't think *this* is a case where I can depart because I *do think that the Guidelines have taken into* [consideration] what's here, *and I'm satisfied that the—this matter is correctly computed.*

**19.** The testimony of an Internal Revenue Service agent that Isabel's bank accounts reflected no cash deposits contemporaneous with the issuance of checks to Lemieux or Descoteaux is not to the contrary. Contemporaneous deposits of Descoteaux's or Lemieux's cash would merely draw attention to these phony payroll check transactions. We will not assume that evidence consistent with Isabel's avoiding such a blunder necessarily shows that Isabel and Descoteaux did not engage in the money laundering transactions.

In their discussion of the sufficiency of the evidence, appellants advance a one-sentence contention that the trial court "did not clearly delineate knowledge [of the unlawful objective of the conspiracy] as an essential element of the conspiracy." Their bare-bones contention is meritless. The district court correctly instructed the jury on the conspiracy charge, stating that in order to convict, the government had to

show that "the defendant ... under consideration *willfully* became a member of such conspiracy." (Emphasis added). Elsewhere, the court instructed that "if a defendant *with an understanding of the unlawful character of a plan knowingly and willfully* joins in an unlawful scheme on one occasion, that is sufficient to convict him for conspiracy." (Emphasis added).

**20.** We quote a portion of the district court statement on which appellants rely:

As far as I'm concerned, *with very few exceptions*, since the Guidelines came into effect, you don't need me sitting here after there's been a conviction, all you need is a computer, push a couple of buttons and that's it. Before that happened, I used to be able to exercise discretion. *Very rarely can I do so now* ....

(Emphasis added).

(Emphasis added). The court plainly understood the nature of its sentencing discretion but determined that there was no justification for departing from the guideline sentencing range in the circumstances of the instant case. Thus, viewed in this, its true light, the district court's decision not to depart is not subject to appellate review. *See Sanchez,* 917 F.2d at 613 (district court decision not to depart below guideline sentencing range unappealable) (citing *United States v. Tucker,* 892 F.2d 8 (1st Cir.1989)).

*Affirmed.*