2 F.3d 1150
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jesse WHITAKER, Jr., Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Willie Lee Burke, Defendant-Appellant.
 Nos. 92-5138, 92-5139.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 11, 1993.
Decided: August 11, 1993.
 
 Appeals from the United States District Court for the District of Maryland, at Baltimore. Norman P. Ramsey, Senior District Judge. (CR-91-119-R)
 Richard Edwin Dunne, III, Hogan & Hartson, Baltimore, Maryland, for Appellant Burke;
 Richard Bruce Bardos, Baltimore, Maryland, for Appellant Whitaker.
 Jan Paul Miller, Assistant United States Attorney, Baltimore, Maryland, for Appellee.
 Christine J. Saverda, Hogan & Hartson, Baltimore, Maryland, for Appellant Burke.
 Richard D. Bennett, United States Attorney, Baltimore, Maryland, for Appellee.
 D.Md.
 AFFIRMED.
 Before NIEMEYER and WILLIAMS, Circuit Judges, and SPROUSE, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 The appellants, Jesse Whitaker, Jr. and Willie Burke, were active participants in a large conspiracy to distribute cocaine.[1] At their joint trial, Whitaker and Burke were convicted by a jury of conspiracy to distribute cocaine and possession with intent to distribute cocaine in violation of 21 U.S.C. Sec. 846. Whitaker alone was also convicted on money laundering charges in violation of 18 U.S.C. Secs. 1956(a)(1)(B)(i) & 2. Both were sentenced to terms of 360 months' imprisonment. On appeal, Burke challenges his conviction, contending that the district court erred in appointing for him, against his wishes, a substitute counsel one month before trial. Whitaker challenges only his money laundering conviction. We affirm the convictions of both appellants.
 
 I. Whitaker's Appeal
 
 2
 Whitaker was principally a distributor in the conspiracy. In late 1989, he approached George Bonnett to help him with the distribution of cocaine in Maryland, offering to split the profits with him. Willie Burke obtained kilogram quantities of cocaine over a period of a year. By February 1990, after Whitaker and Bonnett sold the cocaine in Maryland, the three divided the profits into an equal three-way split. Some of the co-conspirators obtained cocaine in separate ventures and some of the cocaine sold by Bonnett was from those sources. Bonnett testified that Whitaker was directly involved in 25 to 30 kilograms of cocaine, Burke was involved in 35 to 40 kilograms of cocaine, and Bonnett, himself, was involved in approximately 55 to 60 kilograms of cocaine. These facts are not disputed in this appeal. The facts grounding Whitaker's money laundering conviction, however, are disputed.
 
 
 3
 Bonnett testified at the trial that the three Maryland distributors earned a total average profit of $25,000 per kilogram of cocaine distributed. The government contends that Whitaker used part of this profit in late April 1990, to purchase a boat. At that time, Whitaker went to Smith Marine Sales in Baltimore with Elmer Nash, who distributed cocaine for Whitaker. Two years earlier, Whitaker had purchased a small motor boat from the marine's owner, Joseph Smith, and Nash was also a customer of Smith Marine Sales. On this occasion, Whitaker purchased a used, 1986 Wellcraft Runabout. He paid the entire amount, a total of $8,991.50, in cash, which included the purchase price, tax, registration and title fees. Although he was known to the owner, he placed the boat in Nash's name, stating that he wished to keep his name off of the title because he and "Uncle Sam didn't get along too good." Whitaker then rented a slip for the boat, identifying himself as Elmer Nash to the manager at the boatyard. Bonnett, who had pled guilty to the conspiracy charges, testified at trial that Whitaker used proceeds of drug sales for, among other things, the purchase of a boat.
 
 
 4
 The money laundering statute under which Whitaker was convicted provides, in pertinent part:
 
 
 5
 Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specific unlawful activity-
 
 
 6
 ....
 
 
 7
 (B) knowing that the transaction is designed in whole or in part-
 
 
 8
 (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;
 
 
 9
 ....
 
 
 10
 shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.
 
 
 11
 18 U.S.C. Sec. 1956(a)(1)(B)(i).
 
 
 12
 To prove Whitaker guilty of money laundering, the government had to establish that (1) the defendant conducted a financial transaction in interstate commerce; (2) the defendant knew that the proceeds involved in the transaction were the proceeds of some illegal activity; (3) the transaction in fact involved the proceeds of a specified unlawful activity; and (4) the transaction was intended at least in part to conceal or disguise the proceeds of specified unlawful activity. See United States v. Isabel, 945 F.2d 1193, 1201 (1st Cir. 1991). Whitaker claims that the government failed to show that the cash used to purchase the boat was drug distribution proceeds and that the transaction was intended in part to conceal or disguise the drug proceeds. We find no merit to his argument.
 
 
 13
 There is ample evidence to support the jury's finding that Whitaker purchased the boat with money obtained from drug sales. Bonnett, a co-conspirator, testified that the money was from Whitaker's drug[2] profits. The purchase price for the boat and additional charges were paid in cash out of Whitaker's pocket, with the explanation that Whitaker and "Uncle Sam didn't get along too good." There was also ample evidence demonstrating that through the purchase of the boat Whitaker attempted to conceal drug proceeds. The false registration of the boat, the rental of the slip, and operation of the boat titled in Nash's name are all facts from which the jury could infer Whitaker's intent to disguise the ownership of drug proceeds. Viewing the evidence in the light must favorable to the government, there was a reasonable basis for the jury to find Whitaker guilty of money laundering. See United States v. MacDougall, 790 F.2d 1135, 1151 (4th Cir. 1986) (citing Glasser v. United States, 315 U.S. 60, 80 (1942)).
 
 II. Burke's Appeal
 
 14
 After his arrest, at Burke's request, the court appointed attorney J. David Ash to represent him. The joint trial of defendants Burke and Whitaker was scheduled before the late district judge Norman P. Ramsey for November 12, 1991. In early October 1991, however, the government prosecutor discovered that Ash had been appointed to represent a defendant whose trial was to begin on November 4, 1991, before another district judge. That case was expected to last several months; consequently, it was anticipated that Ash could not try Burke's case until at least March 1992. After informing a member of Judge Ramsey's staff of the scheduling problem, the prosecutor was advised to appear before a magistrate. He, Ash, and Ash's client, Burke, appeared before the magistrate on October 8, 1991.
 
 
 15
 Although the government characterizes the magistrate proceeding as a defense request for a continuance to allow Attorney Ash to complete his other assignment before representing Burke at his trial, the defense made no actual motion. Instead, the government explained the scheduling problem to the magistrate. Burke advised the magistrate that he "would like for Mr. Ash to continue[as defense counsel], but you know, it's up to the court." The government advised the magistrate that co-defendant Whitaker would consent to a continuance. The government's position, however, was that Ash should be relieved and new counsel appointed. In the face of Burke's request to keep Ash as counsel even though it meant a continuance until March 1992, the magistrate declined to rule, informing the parties that the trial judge should rule on the conflicting requests for a continuance or appointment of new counsel.
 
 
 16
 Immediately after the magistrate hearing, the government prosecutor and Ash appeared in Judge Ramsey's chambers. Burke was not present. Ash informed Judge Ramsey that Burke preferred to have the trial continued until March 1992 so that Ash could remain as his counsel. Ash expressed concern about a newly-appointed lawyer's ability to prepare adequately for trial in the one month remaining. The prosecutor informed the judge that the government opposed a continuance to March 1992. He based the objection on the difficulties in maintaining security for cooperating witnesses, prejudice to the government resulting from the growing staleness of the evidence, delay in the sentencing of cooperating witnesses, and Speedy Trial Act concerns. Judge Ramsey declined to delay the trial, commenting that sufficient time remained for a new attorney to prepare the defense. He ordered the magistrate to appoint new counsel. On October 9, 1991, Gary A. Ticknor was appointed new defense counsel, and he immediately began preparing Burke's defense.
 
 
 17
 On November 6, 1991, Burke filed a motion to remove Ticknor as counsel, claiming ineffectiveness. Two days later, the court conducted a hearing on that motion with Burke and Ticknor present. Ticknor detailed his preparation for trial. He advised the court that he had spent approximately 100 hours in preparation since his appointment and felt ready to proceed with the trial. Ticknor, however, confirmed that he had declined to file two motions requested by Burke: a motion to demand Judge Ramsey's recusal and a motion to suppress evidence seized from an automobile loaned to Burke at the time of his arrest. Ticknor, in explaining his refusal to prepare the motions, noted that government counsel had assured him the evidence seized in the automobile would not be used at trial and that he had found no basis for a motion asking for Judge Ramsey's recusal. After counsel's presentations, the judge observed that Ticknor was "rendering service to Mr. Burke which is consistent with the best traditions of legal representation by those who are appointed in connection with our criminal justice act appointment here in federal court." He also noted that Ticknor had adequate time to prepare for trial, that he had met all deadlines, and that there was no basis on which Ticknor could in good faith have filed the two motions requested by Burke. In light of these facts, the court refused to remove Ticknor as counsel.
 
 
 18
 On appeal, Burke contends that the district court denied him his due process rights in two instances: first, by ordering the appointment of substitute counsel and, second, by making that ruling as a result of an off-the-record-proceeding where Burke was not present. We find no merit in either argument.
 
 
 19
 Whether we consider the action initiating the court's substitution ruling as a defense motion for continuance as argued by the government or as a government suggestion for substitution of counsel as urged by Burke, our decision remains the same. A ruling on a motion for continuance, of course, is addressed to the sound discretion of the trial court. Morris v. Slappy, 461 U.S. 1, 11 (1983); see Sampley v. Attorney General of North Carolina, 786 F.2d 610, 613 (4th Cir.), cert. denied, 478 U.S. 1008 (1986).
 
 
 20
 Applying that standard, we find no error. Ticknor acted promptly in taking Ash's place. He used his 30-day preparation time wisely. He listened to wiretap tapes for over 70 hours, reviewed affidavits, motions, and other memoranda for 30 hours. He met with Burke on three occasions and waited to meet him for over two hours another time. As the district court noted, Ticknor made a legal judgment that the motions Burke requested had no basis, and Burke fails to allege otherwise. Ticknor represented to the court that he was prepared for trial, and we cannot say that the district court abused its discretion in denying the continuance. See Slappy, 461 U.S. at 11-13 (1983). Moreover, reviewing Burke's complaints on the assumption that the government initiated the rulings by suggesting a substitute counsel, we find no prejudicial diminution of his rights. He cites a host of cases treating the right of a defendant to choose a retained counsel of his or her choice. It is clear, however, that an indigent defendant does not have that right. United States v. Gallop, 838 F.2d 105, 108 (4th Cir.), cert. denied, 487 U.S. 1211 (1988). The Supreme Court in Slappy, moreover, ruled that the Sixth Amendment does not guarantee a defendant, indigent or otherwise, "a meaningful attorney-client relationship." Slappy, 461 U.S. at 13-14. Burke attempts to distinguish his case from Slappy. We fail to see the distinction. For that matter, the district court, before ordering substitution, considered both the reasons offered by the government in support of its position and the reason offered by Ash in support of his position that substitution of counsel should be denied. We have previously described those opposing positions, and we think that if good cause were needed, sufficient good cause exists to support the court's ruling.
 
 
 21
 Likewise, we find no merit to Burke's argument that he was prejudiced by the court ruling in his absence. It is true that a defendant has a constitutional right to be present at any proceeding "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." Snyder v. Massachusetts, 291 U.S. 97, 105-06 (1934), overruled on other grounds, Malloy v. Hogan, 378 U.S. 1 (1964). That due process concern is only implicated, however, if his presence is necessary to a" fair and just hearing." Id. at 108.
 
 
 22
 Burke personally appeared before the magistrate and was represented by his first counsel, Ash, in the hearing before Judge Ramsey that resulted in the substitution of counsel. He makes no showing that he could have added to the representations made on his behalf. We are persuaded that Burke's presence would have added nothing to the fairness of the substitution hearing before the district court.
 
 
 23
 The judgments against both defendant Whitaker and defendant Burke are affirmed.
 
 AFFIRMED
 
 
 [1]
 Numerous other co-conspirators were indicted and pled guilty to the same crimes
 
 
 [2]
 Whitaker argues that he had a legitimate source of income as a construction worker and insinuates that he purchased the boat with these funds. However, Bonnett further testified that Whitaker quit his job as a construction worker soon after he started selling cocaine in late 1989. The boat was purchased in May 1990