# United States Court of Appeals
## For the First Circuit

Nos. 09-1285, 09-1287, 09-1299

UNITED STATES OF AMERICA,

Appellee,

v.

RAFAEL FERNÁNDEZ-HERNÁNDEZ, JULIO ROSARIO-OTERO,
and ÁNGEL GONZÁLEZ-MÉNDEZ,

Defendants-Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

Before

Torruella, Leval[*] and Thompson,
Circuit Judges.

Anita Hill Adames, for appellant Fernández-Hernández.
Raymond L. Sánchez-Maceira, for appellant Rosario-Otero.
Rafael Anglada-López, for appellant González-Méndez.
Thomas F. Klumper, Assistant United States Attorney, with whom
Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson
Pérez-Sosa, Assistant United States Attorney, Chief, Appellate
Division, were on brief, for appellee.

June 30, 2011

---

[*] Of the Second Circuit, sitting by designation.

**LEVAL**, **Circuit Judge**. Defendants Angel González-Méndez ("González"), Rafael Fernández-Hernández ("Fernández"), and Julio Rosario-Otero ("Rosario") (collectively, "Defendants") appeal from their convictions after jury trial. Defendants were convicted of various conspiracy and drug charges arising out of their involvement with a large drug distribution organization, which operated under the name "Los Dementes" and was based in the Juana Matos public housing project in the Cataño area of Puerto Rico. See 21 U.S.C. §§ 841(a)(1), 846, 860. González and Fernández were also convicted of gun charges, arising out of, inter alia, their involvement in the April 25, 2004 killing of three unintended victims on a public highway in a botched attempt to assassinate a rival gang leader. See 18 U.S.C. §§ 924(c), (o). Their sentences included prison terms of life in the cases of González and Fernández, and in Rosario's case, of 151 months. On appeal, Defendants assert numerous challenges to the conduct of their trial and imposition of their sentences, some raised by counsel, others in pro se briefs. In the case of Rosario, we find that while the evidence was sufficient to support his involvement in crimes of drug conspiracy and distribution, it did not support the jury's findings of elevated quantities of drugs. Otherwise, we find no error as to any defendant that would support overturning the judgment. The judgment is therefore affirmed in part, vacated in

part, and the case remanded to the district court for re-sentencing of Rosario.

## BACKGROUND

On October 25, 2007, a grand jury returned a seven-count indictment charging sixty-three individuals with participation in a conspiracy dating from 1998 through 2007 to distribute narcotics at street level in the Cataño and Guaynabo areas of Puerto Rico. Carlos-Croz Mojica, a/k/a "Hueso," was identified as the principal leader of the drug-selling organization, which used the name "Los Dementes." The indictment identified the Juana Matos Public Housing Project ("Juana Matos") as its base of operations, where Los Dementes members used apartments to "store, package, and process" narcotics, including heroin, cocaine, cocaine base ("crack-cocaine"), and marijuana, for sale at drug points located inside and outside Juana Matos.

On August 22, 2008, a grand jury returned a superseding indictment, which in major part repeated the charges asserted in the earlier indictment. It charged González, Fernández, and Rosario, among other co-defendants, with: (1) conspiracy to possess controlled substances with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 846, 860 (Count I); (2) aiding and abetting the possession with intent to distribute of (i) at least one kilogram of heroin, (ii) at least fifty grams of crack-cocaine, (iii) at least five kilograms of cocaine, and (iv) a detectable

amount of marijuana, within 1000 feet of a public housing project or school,[1] in violation of 21 U.S.C. §§ 841(a)(1), 860 (Counts II - V); and (3) using or carrying a firearm "during and in relation to any . . . drug trafficking crime," in violation of 18 U.S.C. § 924(c)(1)(A) (Count VI), and conspiring to commit an offense under § 924(c), in violation of 18 U.S.C. § 924(o) (Count VII). The only offense charged in the superseding indictment that was not charged in the original indictment was Count VII, conspiracy under § 924(o) to use or carry a firearm during and in relation to a drug trafficking crime. The superseding indictment charged, as an overt act in furtherance of this conspiracy, that: "[O]n or about April 25, 2004, in Cataño, Dorado, and elsewhere within Puerto Rico," defendants, including Gonzales and Fernández, "carried and used firearms, to include fully automatic pistols and rifles (machine guns)." (In relation to this overt act, the government's evidence at trial showed that González and Fernández, along with other Los Dementes members, killed three bystanders in a failed attempt to murder a rival gang leader.)

Most of the defendants named in the indictments pled guilty. González, Fernández, and Rosario proceeded to trial on October 1,

---

[1] 21 U.S.C. § 860 establishes enhanced penalties for "[a]ny person who violates section 841(a)(1) . . . by distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of, the real property comprising a public or private elementary, vocational, or secondary school or . . . housing facility owned by a public housing authority . . . ." 21 U.S.C. § 860(a).

2008. The government's theory was that González, prior to his arrest for bank robbery in 2004, owned a drug point outside of Juana Matos in the Vietnam Ward in Cataño and that he operated this drug point as part of the Los Dementes organization; that Fernández was a seller and enforcer for Los Dementes, working principally at González's Vietnam Ward drug point and eventually taking over that operation; and that Rosario was also a member of Los Dementes, who owned a drug point outside of Juana Matos in either the Amelia or the Vietnam Ward.

At trial, the government presented the testimony of several FBI agents and Puerto Rico Police Department ("PRPD") officers who were tasked to the Los Dementes investigation. They testified to, inter alia, surveillance, controlled buys, and the seizure of drugs, cash, and weapons at the Juana Matos housing complex. The government's evidence linking Defendants to the conspiracy was primarily the testimony of three cooperating witnesses: Alexis García-Heredia, a Los Dementes member, who testified to selling drugs at González's drug point in the Vietnam Ward and participating with González and Fernández in the April 2004 killing (he was one of the shooters); William Rosario-Garcia ("William Rosario"), a co-defendant, who testified for the government to performing various errands on behalf of Los Dementes members at Juana Matos; and Joaquin Casiano, an informant placed by the FBI in Juana Matos for several months in 2005. We discuss the evidence at

trial in greater detail in connection with the Defendants' various claims of error.

Following Rule 29 motions, the court dismissed the gun charges (counts VI and VII) against Rosario for insufficient evidence. It also dismissed the claim for forfeiture against all the defendants (count XIII). On October 17, 2008, after approximately ten days of trial, the jury returned guilty verdicts against all three defendants. It found González guilty of the conspiracy charge, the substantive heroin, crack-cocaine, and cocaine charges, and the gun charges under §§ 924(c) & (o). Fernández was found guilty of the same, excepting the heroin charge, of which he was acquitted. Rosario was found guilty of the conspiracy and the substantive cocaine and crack-cocaine charges.[2] On the marijuana charge, all three defendants were acquitted.

The court held sentencing hearings on February 2, 2009. In determining González's and Fernández's guidelines range, the district court applied United States Sentencing Guidelines § 2D1.1(d), the "murder cross-reference," which provides: "If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 . . . apply [the level for first or second degree murder] as appropriate . . . ." The court sentenced

[2] On each of the substantive drug counts, the jury convicted Defendants of possessing with intent to distribute specified drug quantities: at least one hundred fifty grams of crack-cocaine, at least five kilograms of cocaine, and as to González, at least one kilogram of heroin.

-6-

González and Fernández to life imprisonment.  The court sentenced Rosario to 151 months imprisonment, which was above the statutory mandatory minimum of ten years in connection with the drug offenses, see 21 U.S.C. § 841(b)(1)(A), but at the bottom of his guidelines range.

## DISCUSSION

### I.  Jury Notes

Defendants argue, for the first time on appeal, that the district court violated their Sixth Amendment right to counsel as well as Federal Rule of Criminal Procedure 43 by responding to notes received from the jury during deliberations without alerting counsel to the fact of the notes and outside of the presence of Defendants and their counsel.  The government concedes that the district court erred procedurally, but contends that the Defendants were not prejudiced by the violations.  We agree.

On October 17, 2008, the court charged the jurors, and at 2:15 p.m. sent them to deliberate.  The court advised the parties to "Stay around in the courthouse.  In case we need you, we'll call from outside."  The court received a note from the jury at 3:15 p.m.  In this note, marked as Note #2,[3] the jury requested (in

---

[3] Fernández argues through counsel (who was not trial counsel) that the record reveals that the court never "took care of" or responded to "Jury Note One."  Fernández Br. at 9.  This is not correct.  The record reveals that on October 10, 2008, during the lunch recess, the jury sent a note to the court, marked as Note #1, asking that two questions be put to government witness William Rosario.  After receiving the note from the jury, the court read the questions to

Spanish) a copy of the transcript of the testimony of the cooperating witness García-Heredia. The court immediately responded in writing, "The transcript is not available, it would have to be prepared," and "You should first rely on your collective memory." The government concedes that the first part of the court's response was inaccurate: a copy of the transcript of García-Heredia's testimony had been posted on the court's electronic filing system on October 9, 2008, and accordingly, was available to be read back to the jury. A second note was received at 3:18 p.m. In this note, marked as Note #3, the jury requested (this time in English) a transcript of García-Heredia's grand jury testimony. The court immediately responded in writing, "This testimony is not in evidence – no party proposed it."

At 4:11 p.m., trial reconvened, and the court informed counsel that the jury had reached a verdict. Prior to reading the verdict, the court called counsel to a sidebar and explained that it had received and responded to Notes #2 and #3. The court said that it had tried unsuccessfully to reach counsel, and showed the notes. The court advised counsel it had provided a "[b]oiler plate type of

counsel, heard argument, and determined that it would ask the questions in a neutral way. There was no objection. Upon resuming trial, the court questioned the witness. Fernández's counsel appears to be confusing the first note received during deliberations, which was marked as Note #2 but which was identified in the minutes pertaining to that trial day as "note 1," with the earlier note, which, as noted above, was received and taken care of during trial.

answer of the type suggested always when these type of things happen, okay?" González's counsel responded, "Yes, sir." Fernández's counsel made a comment on the content of the notes. There was no objection or further inquiry by any counsel into the substance of the court's responses to the notes.

We have held that "[a] district court's failure to attempt to inform defense counsel about the existence of a jury note, and further failure to solicit defense counsel's input regarding any response to such a note, violates Rule 43 of the Federal Rules of Criminal Procedure." United States v. Gonzalez-Melendez, 570 F.3d 1, 2 (1st Cir. 2009); see United States v. Ofray-Campos, 534 F.3d 1, 17 (1st Cir. 2008); see also Rogers v. United States, 422 U.S. 35, 39 (1975) (noting that the court's prior rulings, and those interpreting Rule 43, "make clear . . . that the jury's message should have been answered in open court and that petitioner's counsel should have been given an opportunity to be heard before the trial judge responded"); cf. Fed. R. Crim. P. 43(a)(2) (the defendant's presence is required at "every trial stage, including jury impanelment and the return of the verdict").[4] There is no

_____

[4] In United States v. Maraj, 947 F.2d 520 (1st Cir. 1991), we set forth the proper procedure for handling a note from the jury:

> The preferred practice for handling a jury message should include these steps: (1) the jury's communique should be reduced to writing; (2) the note should be marked as an exhibit for identification; (3) it should be shown, or read fully, to counsel; and (4) counsel should be given an opportunity to suggest an appropriate rejoinder. If the note

question that, in its procedure in responding to Notes #2 and #3, the district court erred. Counsel should have been advised of the notes and been offered the opportunity to suggest responses (or object to the court's proposed responses).[5] However, the Defendants did not object when the court revealed the jury notes. Although counsel did not learn of the notes until the jury had reported that it had reached a verdict, the possibility of curing the error remained open as the court could have told the jury that the referenced transcript did exist, caused it to be read to them, and instructed them to continue to deliberate. Defendants' failure to bring the claim of error to the district court's attention results in the forfeiture of the claim. See United States v.

---

> requires a response ore tenus, the jury should then be recalled, the note read into the record or summarized by the court, the supplemental instructions given, and counsel afforded an opportunity to object at sidebar. If, however, the note is to be answered in writing, the court's reply should be marked as an exhibit for identification, the judge should read both the jury's note and the reply into the record, and counsel should be afforded an opportunity to register objections before the reply is transmitted to the jury.

Id. at 525; see Ofray-Campos, 534 F.3d at 17 ("The rules for handling a jury note that are set forth in Maraj are well-settled.").

[5] Although the court told counsel at the time it revealed the notes that it had attempted unsuccessfully to contact counsel, according to the record only one minute passed between the court's receipt of the notes and its responses to the jury. While the need for a rapid response may vary depending on a number of circumstances, in this case, especially in view of the unclear status of the trial transcript, no good reason appears why the court should not have made more than one minute's effort to reach counsel.

Rodríguez-Lozada, 558 F.3d 29, 38 (1st Cir. 2009).

Pursuant to Federal Rule of Criminal Procedure 52(b), "[a]n appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Marcus, ___ U.S. ___ , 130 S. Ct. 2159, 2164 (2010) (internal quotation marks and alterations omitted); see United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). We see no reason to believe this error either affected Defendants' substantial rights or affected the fairness or integrity of the trial.

With respect to Note #3, the court properly responded that García-Heredia's grand jury testimony was not in evidence and could not be provided. Defendants cannot show they were prejudiced, as nothing more could have or would have been done if counsel had been made aware of the jury's inquiry prior to the court's response. See Maraj, 947 F.2d at 526 (error in handling jury note did not adversely affect defendant's substantial rights, because the judge's response to the note was satisfactory and "had the full note been contemporaneously disclosed, there was nothing more that

defense counsel could appropriately have done to protect their client's rights").

With respect to Note #2, Defendants have not shown that the court's incorrect response was prejudicial or that it affected the fairness or integrity of the proceedings. There was no error in instructing the jury that they should rely on their collective memory of García-Heredia's trial testimony. Even if the court had been aware of the existence of the transcript, it would not necessarily have been read to the jury. Trial courts have discretion whether to do so. See United States v. Akitoye, 923 F.2d 221, 226 (1st Cir. 1991) ("[W]e have long and repeatedly held that rereading testimony during jury deliberations rests in the presider's sound discretion."). Appellants argue that the verdict might have been different had the testimony been provided. That is, of course, a possibility, but they make no persuasive argument supporting such a likelihood. García-Heredia's testimony was decidedly unfavorable to the Defendants, and they do not show that it was impeached in cross-examination in any significant fashion, other than the obvious point of his aiding his own case by testifying against the Defendants, which the Defendants forcefully communicated to the jury in their summations. The procedural error did not prejudice the Defendants.

## II. Voir Dire of Prospective Jurors

Rosario, in a supplemental pro se filing, also argues that the

court violated his constitutional rights as well as Federal Rule of Criminal Procedure 43 by questioning certain prospective alternate jurors outside of his presence. We disagree. The court's questioning of the prospective jurors outside the presence of the Defendants was justified, and, in any event, Rosario waived any right to be present pursuant to Rule 43 by his failure to object at trial.

After selection of twelve jurors and four alternate jurors, the court called counsel to a side bar. The judge told them that he and a security officer observed two of the alternate female jurors laughing and sticking their tongues out at Rosario "like, 'I know you.'" The court determined that it would question the two alternates, and ordered that the Defendants be removed from the courtroom. There was no objection. With counsel for each of the Defendants present, the court questioned the two alternate female jurors, who said that they did not know any of the Defendants. The court decided, nevertheless, to excuse the two alternates.

A criminal defendant has a constitutional right to be present at "all stages of the trial where his absence might frustrate the fairness of the proceedings." See, e.g., Faretta v. California, 422 U.S. 806, 819 n.15 (1975). As noted above, Federal Rule of Criminal Procedure 43 further provides that a defendant must be present at "every trial stage, including jury impanelment and the return of the verdict," Fed. R. Crim. P. 43(a)(2), except at stages

-13-

where, inter alia, "[t]he proceeding involves only a conference or hearing on a question of law," Fed. R. Crim. P. 43(b)(3). Defendants need not be expressly warned of their rights under Rule 43, and a defendant's failure to assert his right to be present or to object to a purported violation of the rule may result in a valid waiver of the right. See United States v. Gagnon, 470 U.S. 522, 529 (1985); United States v. Peterson, 385 F.3d 127, 137 (2d Cir. 2004); United States v. Brantley, 68 F.3d 1283, 1291 (11th Cir. 1995).

In Gagnon, a multi-defendant trial, the Supreme Court rejected a claim that a conference attended by one of the defense counsel and a juror, regarding a concern expressed by that juror that one of the defendants "had been sketching [portraits of] jury members during the trial," violated the defendants' constitutional right to be present. 470 U.S. at 523. The Supreme Court recognized that "[t]he mere occurrence of an ex parte conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right." Id. at 526 (quoting Rushen v. Spain, 464 U.S. 114, 125-26 (1983) (Stevens, J. concurring in the judgment)). The Court explained that the conference at issue, "a short interlude in a complex trial[,] . . . was not the sort of event which every defendant had a right personally to attend." Id. at 527. The defendants "could have done nothing had they been at the conference, nor would they have gained anything by attending." Id.

As in Gagnon, Rosario's absence from the bench conference did not deprive him of any constitutional right. It did not detract from his defense or in any way affect the fairness of his trial. See id. at 526 (explaining that due process concerns are implicated "[w]henever [the defendant's] presence has a relation, reasonably substantial, to the [fullness] of his opportunity to defend against the charge . . . [and] to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only"). Rosario was removed (as were his co-defendants) for only a brief period of time, and his interests were sufficiently protected by his counsel's presence at the conference. See United States v. Bertoli, 40 F.3d 1384, 1397, 1399-1401 (3d Cir. 1994); see also United States v. Collazo-Aponte, 216 F.3d 163, 182 (1st Cir. 2000) (finding no Rule 43 violation where the defendant was "restricted from full participation in a limited number of sidebar conferences that occurred during voir dire" but otherwise was "present at, and fully participated in, his trial"), vacated on other grounds, 532 U.S. 1036 (2001).

Furthermore, even assuming Rosario had a statutory right to be present under Rule 43 in these circumstances (a proposition we doubt), he waived that right by remaining silent. When the court ordered that the Defendants be removed from the courtroom, Rosario had the opportunity to object, but did not. As in Gagnon, Rosario's "total failure to assert [his] right[] to attend the

-15-

conference with the juror sufficed to waive [it] under Rule 43."
Gagnon, 470 U.S. at 529. "If a defendant is entitled under Rule 43 to attend certain 'stages of the trial' which do not take place in open court, the defendant . . . must assert that right at the time . . . [and] may not claim it for the first time on appeal from a sentence entered on a jury's verdict of 'guilty.'" Id.; see Peterson, 385 F.3d at 138; Collazo-Aponte, 216 F.3d at 182.

## III. Right to Jury Selected from Fair-Cross Section of the Community

González and Rosario argue, for the first time on appeal, that they were deprived of their Sixth Amendment right to a trial before a jury representing a fair cross-section of the community. They argue that the jury that convicted them was not drawn from a fair cross section of the community, as it was an English-speaking, "white-collar," and "highly professionally oriented" group drawn from a "universe of less than 16% of" their peers. The local plan for the District of Puerto Rico requires that jurors be sufficiently proficient in English to render satisfactory jury service, see, e.g., United States v. Candelaria-Silva, 166 F.3d 19, 29-30 (1st Cir. 1999), and yet, according to Defendants, eighty percent of Puerto Rico residents have little command of English. (The eighty percent figure is based on certain U.S. census surveys cited in Defendants' briefs on appeal.) Because this contention, at least as it pertained to the composition of the trial jury, was not raised in the district court, it is subject to review only for

-16-

plain error. Even if it were properly preserved for review, Defendants' contention is foreclosed by our precedents, which have repeatedly upheld the English proficiency requirement against such challenges in Puerto Rico district court. See United States v. Rodríguez-Lozada, 558 F.3d 29, 38 (1st Cir. 2009) (concluding that the English proficiency requirement was "justified by the overwhelming national interest served by the use of English in a United States court" (quoting United States v. González-Vélez, 466 F.3d 27, 40 (1st Cir. 2006))); United States v. Dubón-Otero, 292 F.3d 1, 17 (1st Cir. 2002). Defendants offer no persuasive reason for reconsidering our prior rulings.

## IV. Spanish Translation of Jury Instructions

González argues for the first time on appeal that his right to a fair trial was violated because the district court did not provide the jury with a Spanish translation of the jury instructions. González's argument is forfeited for failure to raise it below, and is in any event foreclosed by our precedents. In United States v. Gonzalez-Maldonado, 115 F.3d 9 (1st Cir. 1997), we explained that the practice of charging the jury using non-English words was "inadvisable and should be discouraged" and instructed "district courts to frame instructions in English." Id. at 18-19. As noted above, the governing rules require that all jurors speak, read, and write in English with proficiency. At the jury selection phase, the Defendants were not rebuffed in any

effort to test any juror's comprehension of English.  González has failed to show any error (let alone plain error).

## V. Sufficiency of the Evidence

Defendants challenge the sufficiency of the evidence supporting their convictions.  We review de novo the district court's denial of a motion made under Rule 29 for judgment of acquittal.  <u>United States</u> v. <u>Giambro</u>, 544 F.3d 26, 29 (1st Cir. 2008).  In doing so, we view the evidence in the light most favorable to the jury's guilty verdict and assess whether a reasonable factfinder could have concluded that the defendant was guilty beyond a reasonable doubt.  <u>See</u> <u>United States</u> v. <u>Lipscomb</u>, 539 F.3d 32, 40 (1st Cir. 2008).  We conclude that the evidence was sufficient to support the jury's verdict as to González and Fernández.  However, in the case of Rosario, we conclude that while the evidence was sufficient to support the jury's verdict as to his involvement in crimes of drug conspiracy and distribution, it did not support the jury's findings of elevated quantities of drugs.  Accordingly, we vacate the district court's judgment as to Rosario to the extent it included the elevated quantities, and remand for re-sentencing.

### 1) <u>González and Fernández.</u>

The evidence was clearly sufficient to show that González and Fernández were involved in the Los Dementes drug distribution operation, which operated out of the Juana Matos housing project

-18-

and sold drugs at a drug point owned by González on F street in the Vietnam Ward. Much of the evidence was provided by the testimony of García-Heredia, who testified that he had been a member of Los Dementes and sold drugs, including heroin, cocaine, crack-cocaine, and marijuana, for the organization. He identified González as the owner of the drug point, and Fernández as having sold drugs and having acted as an enforcer at the drug point.[6] According to García-Heredia, drugs were routinely delivered from Juana Matos to the Vietnam location by Los Dementes principals, and these drugs were sold under so-called "brand names," including Pokemon, that were exclusive to Los Dementes drug points. (Other evidence established the large quantities supporting the jury's verdict.)[7]

García-Heredia also testified to his involvement, together with González and Fernández, in the April 25, 2004 murders, which formed the basis for the convictions under Sections 924(c) and (o). As part of a war between Los Dementes and a rival drug organization, Las Palmas, Los Dementes members attempted to kill Las Palmas's leader, Gilberto El Reyes. According to García-Heredia, while González drove the car, he and Fernández opened fire

---

[6] There was also testimony that, by May 2004 (following González's arrest for bank robbery), Fernández operated the Vietnam Ward drug point and that drugs at Juana Matos were packaged for Fernández to sell in the Vietnam Ward.

[7] During a two-month surveillance of the Juana Matos drug points, the evidence established that the drug conspiracy sold "about 71,000 decks of heroin, 62,000 baggies of cocaine, 300,000 vials of 'crack,' and 60,000 baggies of marijuana."

(he with two semi-automatic .38 revolvers and Fernández with an AK-47) on another car they believed belonged to El-Reyes's son.  Three passengers in the car were killed.  (It turned out that the car did not belong to El Reyes's son; none of the victims were involved in the drug trade.)

González and Fernández argue that the convictions under 21 U.S.C. § 860 must be vacated because the drug sales in the Vietnam Ward were not within 1000 feet of a public housing project or school, as they contend is required by that statute.[8]  This argument is without merit.  Section 860 does not require that the drug sales take place within 1000 feet of a housing project or school.  The charges under § 860 included <u>possession</u> of drugs within 1000 feet of a hosing project or school, with intent to distribute.  The evidence showed that González and Fernández, with intent to distribute, aided and abetted in such possession within 1000 feet of a protected location (in this case, Juana Matos and two schools located therein).[9]  <u>See</u> <u>United States</u> v. <u>DeLuna</u>, 10

---

[8] 21 U.S.C. § 860 provides in relevant part that:  "Any person who violates section 841(a)(1) of this title . . . by distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of, the real property comprising a public or private elementary, vocational, or secondary school or . . . housing facility owned by a public housing authority . . . is subject to (1) twice the maximum punishment authorized by section 841(b) of this title . . . ."

[9] Fernández argues in a supplemental pro se filing that the convictions under Sections 924(c) and (o) must be vacated because there was insufficient evidence of a "nexus" between the April 25, 2004 killings and the drug trafficking charges.  We disagree.  The

-20-

F.3d 1529, 1534-35 (1st Cir. 1993).

2) <u>Rosario</u>.

Rosario was convicted of drug conspiracy, and of possession with intent to distribute at least one hundred fifty grams of crack-cocaine and five kilograms of cocaine. <u>See</u> 21 U.S.C. §§ 841(a)(1), 846, 860. We conclude first that the evidence was sufficient to show that Rosario participated in the drug conspiracy and that he possessed or aided and abetted the possession of drugs at Juana Matos with intent to distribute.

The evidence of Rosario's participation came in principally through two witnesses: Casiano and William Rosario. Casiano was an FBI informant placed in Juana Matos as an outside observer for approximately two months, from February through April 2005. Casiano testified that he saw Rosario attend what Casiano characterized as a March 2005 peace meeting between Los Dementes and Las Palmas members at Juana Matos, and that when he saw Rosario at the housing complex, "[h]e would always be with Hueso."[10]

_____

evidence showed that González and Fernández attempted to murder El-Reyes as part of a war between the two drug organizations, and did so with the participation of other Los Dementes members. The attempted murder was sufficiently connected to the drug trafficking crime to satisfy Section 924(c)'s "during and in relation to" requirement.

[10] In the district court, Rosario moved for a mistrial on the grounds that the government engaged in misconduct by permitting Casiano to testify allegedly falsely about Rosario's presence at the peace meeting. The basis for this accusation was that Casiano had previously told the government that he could not identify Rosario on the basis of a photo given to him. The court summarily

-21-

Casiano testified that "Hueso was the leader, and not everybody got to hang out with him." According to Casiano, only close associates in the drug business could "hang out" with Hueso.

William Rosario, the cooperating witness, testified to performing various drug-related tasks and errands for members of Los Dementes at Juana Matos. He confirmed that the defendant Rosario "would spend all of his time with, you know, with the big people in the organization, with Hueso." "More than twice" he saw the defendant Rosario in an apartment in "Building 50" – one of the principal apartments where Los Dementes members would prepare drugs – at times when drugs were being prepared. He saw the defendant Rosario there with other members of the organization. According to William Rosario's testimony, the apartment was outfitted with steel-plated doors and video cameras for surveillance. He testified that there were "a lot of drugs and a lot of money" at the apartment. He estimated that Los Dementes members processed approximately 1/4 kilogram of cocaine into crack (the equivalent of about 1000 vials of crack) in the apartment approximately three or four times per week, and that he often saw approximately $5000 in

denied the motion, and Rosario appeals from the denial. We see no basis for grant of new trial, nor any showing of misconduct on the current record. Rosario was given an adequate opportunity to develop this (or any other) inconsistency on cross-examination. Casiano testified that, although he did not recognize Rosario from the picture, he realized in the courtroom that the defendant was "Julio Hotdog" (Rosario's nickname), who he remembered from his time at Juana Matos. The government was entitled to solicit this testimony and the jury was entitled to credit it.

-22-

cash being counted there (by machine).

William Rosario also testified about two specific drug-related interactions he had with the defendant Rosario. In the first, the defendant Rosario took William to Rosario's aunt's house in a neighboring housing complex, where Rosario had William "cook" and "taste" (tasks he often performed at Juana Matos) a small sample from a bag of cocaine (the bag's weight was approximately 1/8 kilogram). In the second, William washed a car for Rosario, and in return, Rosario paid him with six or seven vials of crack. In response to a question from the jury as to whether he knew if "in the Building 50 they prepare drugs for Julio Rosario," William testified: "I could not tell you that I was there when they were preparing drugs for Julio. But I can say that on one day, when I washed a car for him, he told me that after I finished, that he was going to go to apartment 50 and that he was going to pay me with what they were preparing for him."

Finally, the government introduced evidence that, following the October 2007 indictment and arrests, Rosario fled and took on a new identity. When he was apprehended in 2008 by the U.S. Marshals Service, he was found in possession of a fake driver's license and social security card (both in the name of "Omar Palma"). When confronted with the fake documents, Rosario admitted that "he was assuming the identity of Mr. Omar Palma while being a fugitive." The government argued – and the jury was entitled to

find – that Rosario's attempt to evade arrest demonstrated a consciousness of guilt.[11]

Taken together, and in the light most favorable to the verdict, this evidence was sufficient to support the jury's findings that Rosario was guilty of participation in the drug distribution conspiracy and of aiding and abetting the possession of drugs with intent to distribute.[12]

---

[11] Rosario argues that the district court erred in admitting evidence of his flight because (1) the evidence was admitted without the necessary showing of extrinsic evidence of guilt, and (2) the evidence was highly prejudicial and should have been excluded pursuant to Fed. R. Evid. 403. We reject these contentions. "A district court is afforded considerable leeway when determining whether evidence of a defendant's flight is accompanied by a sufficient factual predicate . . . [and] is afforded similar latitude in determining whether the evidence passes the Rule 403 balancing test." United States v. Benedetti, 433 F.3d 111, 116 (1st Cir. 2005). We believe there was sufficient extrinsic evidence of Rosario's guilt to support admission of the flight evidence. Nor can we say that the district court acted outside of its discretion in admitting the flight evidence pursuant to Rule 403. We note further that the district court instructed the jury – instructions we presume it followed – that flight alone is not a sufficient basis to convict, but rather should be considered in light of all the evidence presented at trial. We discern no reversible error in connection with the admission of the flight evidence.

[12] We note that Rosario testified as part of the defense case, denying his involvement in any drug-related activities at Juana Matos. He denied that Los Dementes was a drug distribution organization. He also implausibly asserted that Hueso was simply a "recreational leader" at the housing complex. The jury was entitled to disbelieve the defendant's testimony and use its disbelief to supplement the other evidence against him. See United States v. Abou-Saada, 785 F.2d 1, 10 (1st Cir. 1986); see also United States v. Velasquez, 271 F.3d 364, 374 (2d Cir. 2001) (defendant's "incredible" testimony "transform[ed] the evidence in this case from borderline to sufficient").

On the other hand, we conclude that the evidence was insufficient to support a finding, beyond a reasonable doubt, that Rosario was responsible for the elevated drug quantities of which he was convicted, i.e., at least one hundred fifty grams of crack-cocaine and five kilograms of cocaine. The government relied on testimony that Rosario, like González and Fernández, owned a drug point outside of Juana Matos, which, if proved, would presumably be sufficient to show responsibility for large quantities. There was, however, no competent evidence of his ownership of a drug point. William Rosario testified that "from what [he] knew, [Rosario] had a crack point" outside of Juana Matos. When asked on direct examination how he knew Rosario was a drug point owner, William Rosario did not give any intelligible explanation. On cross-examination, William Rosario acknowledged that his basis for believing Rosario had a drug point was "because somebody told [him]." William Rosario accordingly had no competent basis for testifying that Rosario had a drug point. Nor has the government identified for us any other evidence from which a rational trier of fact could conclude that Rosario had a drug point.

We recognize that there was evidence of large quantities of drugs, money, and drug dealing paraphernalia at the apartment in Building 50, and there was evidence that Rosario was seen "more than twice" in that apartment, including at least one occasion when drugs were being prepared. But there was no evidence showing that,

on any occasion when Rosario was at the apartment, he would inevitably have seen large-scale operations being conducted there. Nor did the evidence show Rosario's awareness of the continuity of sustained drug preparation there. While the government might have been able to elicit such testimony with properly focused questions, it did not do so. In order to support a criminal conviction, evidence must be sufficient to support a finding beyond a reasonable doubt of the essential elements. Without doubt there was evidence from which jurors could speculate as to Rosario's awareness of the large-scale operation in which he participated, but the evidence as to him was sketchy and could not support a finding beyond a reasonable doubt.

Accordingly, while we affirm Rosario's convictions on the various drug offenses, we vacate the judgment to the extent that it incorporated convictions based on the jury's findings of elevated quantities. Because Rosario's overall sentence was predicated in part on these convictions for elevated quantities, and because the charges alleging elevated quantities included mandatory minimum sentences,[13] we vacate Rosario's sentence. At Rosario's sentencing hearing, the district court treated the jury's findings of elevated

---

[13] The jury found the Defendants responsible for drug quantities of at least five kilograms of cocaine and at least one hundred fifty grams of crack-cocaine. These quantities, under 21 U.S.C. § 841(b)(1)(A), trigger a term of imprisonment of at least ten years and not more than life. See United States v. Cruz-Rodriguez, 541 F.3d 19, 32 n.11 (1st Cir. 2008).

quantities as determinative. As set forth above, there was insufficient evidence to support the jury's findings as to quantity. On imposing sentence upon remand, the district court shall make any necessary findings as to drug quantities attributable to Rosario, in accordance with our decisions in United States v. Colon-Solis, 354 F.3d 101 (1st Cir. 2004), and United States v. Correy, 570 F.3d 373 (1st Cir. 2009).[14]

## VI. Sentencing Challenges

We review a "district court's sentence for reasonableness, which involves a procedural as well as a substantive inquiry." United States v. Politano, 522 F.3d 69, 72 (1st Cir. 2008). The first task is to determine whether the district court made any procedural errors "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts or failing to adequately explain the chosen sentence – including an explanation for any deviation from the Guidelines range." Gall v. United States, 552 U.S. 38, 51 (2007); United States v. Stone, 575 F.3d 83, 89 (1st Cir. 2009). In addition, we review the substantive reasonableness of the sentence imposed. The standard of review as

---

[14] This opinion expresses no view as to the quantities the sentencing court may properly attribute to Rosario when the standard, unlike the standard for conviction, is preponderance of the evidence.

to substantive reasonableness is abuse of discretion.  Politano, 522 F.3d at 72.  "[W]hen a defendant fails to preserve an objection below, the plain error standard supplants the customary standard of review."  United States v. Dávila-González, 595 F.3d 42, 47 (1st Cir. 2010).

González contends that the district court's imposition of a term of life imprisonment was procedurally unreasonable because it was done without proper consideration of the sentencing factors outlined in 18 U.S.C. § 3553(a), was based on an erroneous assumption that the court was compelled to adhere to the guideline range, and was substantively unreasonable.[15]  We reject these contentions.

The court determined that González's guidelines range was life imprisonment, based on an offense level of 43 and a Criminal History Category of II (the result of a prior guilty plea to bank robbery and gun charges).[16]  If the court finds by a preponderance of the evidence that a murder was committed in furtherance of a drug conspiracy, the Guidelines provide for a base offense level of 43.  See U.S.S.G. § 2D1.1(d)(1) ("If a victim was killed under

---

[15] González was sentenced to 480 months imprisonment on Count I (drug conspiracy); life imprisonment on Counts II, III, and IV (the substantive drug charges); 240 months imprisonment on Count VII (the violation of 18 U.S.C. § 924(o)), to run concurrently with the other counts; and life imprisonment on Count VI (the violation of 18 U.S.C. § 924(c)), to run consecutively with the other counts.

[16] U.S.S.G. §  2A1.1 states that the base offense level for first degree murder is 43.

circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder) . . . ."); see also United States v. Avilés-Colón, 536 F.3d 1, 27 (1st Cir. 2008).  The evidence of the April 25, 2004 murders made this offense level applicable.[17]  Nor is there reason to doubt that the court recognized its obligation to consider the obligatory sentencing factors of 18 U.S.C. § 3553(a), or the advisory nature of the Guidelines since Booker.  See 2/2/09 Sentencing Hr'g Tr. (González) at 43-44 ("We have looked at this in the context of the advisory guidelines.  We have looked at it in our own mind in the context of 3553(a). What is really salient in the analysis is the – is the issue of total disregard for the life of others, especially the total loss of three innocent lives that were murdered on a well-trafficked road in Puerto Rico.")  That the court did not discuss mitigating factors advocated by González is of no significance.  Sentencing judges are not obligated to set forth their appraisal of the pertinent factors.  Dávila-González, 595 F.3d at 48.  We find no procedural unreasonableness in the court's imposition of sentence.  Nor do we find any reason to doubt the substantive unreasonableness of the sentence imposed on

---

[17]  The court also determined that a four-level leadership enhancement applied pursuant to U.S.S.G. § 3B1.1(a), because the defendant was a leader of criminal activity involving five or more participants.  Because 43 is the highest possible offense level under the Guidelines, González's offense level remained 43.

González, especially in view of his wanton killings.

Fernández, in a pro se supplemental brief, also challenges the reasonableness of his sentence. Fernández's principal objection is to the application of the Guidelines' murder cross-reference in determining his guidelines range. As discussed above in connection with González's sentence, evidence of Fernández's participation in the April 25, 2004 murders made a base offense level of 43 applicable. See U.S.S.G. § 2D1.1(d)(1). We have considered Fernández's remaining sentencing arguments, and find them without merit.[18]

## VII. Notice of Charges

González and Fernández argue that the superseding indictment failed to provide adequate and timely notice of the charges relating to the April 25, 2004 murders and thus violated their Sixth Amendment rights to notice of accusation. González raises the argument for the first time on appeal.[19] Fernández in the district court did not object to the filing of the new charges, but moved to exclude evidence of the murders. Regardless of the proper standard of review, we find no error.

---

[18] Because we vacate Rosario's sentence in its entirety, we do not address the sentencing arguments advanced by Rosario on appeal.

[19] On September 4, 2008, González, through counsel, filed an in limine motion seeking to suppress certain video evidence relating to the April 25, 2004 murders, which the motion described as "raw, gruesome, and inflammatory." The motion did not argue that González's Sixth Amendment rights were violated.

The charges added by the superseding indictment returned on August 22, 2008 did not expand the scope of the evidence as to the Defendants. The original indictment included a charge under 18 U.S.C. § 924(c), alleging their use of firearms. The only pertinent change in the superseding indictment was to add a charge under 18 U.S.C. § 924(o) of conspiracy to commit the violation of § 924(c), which set forth as an overt act that: "[O]n or about April 25, 2004, in Cataño, Dorado, and elsewhere within Puerto Rico," defendants, including González and Fernández, "carried and used firearms, to include fully automatic pistols and rifles (machine guns)." The shooting down of the three occupants of the car which the Defendants mistakenly believed carried the drug rival's son was provable under the earlier indictment without need for the supplemental charge. The addition of this specification of an overt act in furtherance of the Section 924(o) conspiracy did not enlarge the admissible evidence. As the Dorado shootings in furtherance of a drug dealing war were evidence of both the narcotics and firearms offenses, they would have been admissible even if the superseding indictment had not been filed. Furthermore, the Defendants had been put on notice of this evidence long before the filing of the superseding indictment by the government's designation of evidence. Defendants have not asserted that the government's allegedly tardy filings impaired their trial preparation or their ability to present a defense. Nor have

Defendants argued on appeal that the district court abused its discretion in not delaying trial to permit further investigation or preparation. The argument is therefore forfeited. We see no basis for disturbing the convictions of either González or Fernández on this ground.

## VIII.  Hearsay Statements of Cooperating Witnesses

Defendants argue that the district court erred by provisionally admitting alleged hearsay testimony by certain cooperating government witnesses, without having later made a final determination that such testimony satisfied Fed. R. Evid. 801(d)(2)(E)'s requirements for the admission of co-conspirator testimony.[20]  The argument is without merit.

On the first day of trial, the government elicited testimony from García-Heredia about certain statements made to him by González about their intention to go ahead with the attempted assassination of the Las Palmas leader.  González's counsel objected to the testimony on the grounds that it was hearsay, and argued that for the statement to be admissible the court had to make a finding that García-Heredia was engaged in a conspiracy with the Defendants.  The court responded that, under our precedent in United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977), it could make a tentative determination that González and García-

_____

[20] This argument was raised by at least González and Fernández in Rule 29 motions filed after trial.

Heredia were members of a drug conspiracy, and if the statement was in furtherance of the conspiracy, it could be admitted. The court stated that it would make final determinations on these issues after it heard all the evidence. González's counsel agreed, and there was no further inquiry. (This came up again during the testimony of Casiano, with respect to statements made to him by alleged members of the conspiracy during his undercover assignment at Juana Matos. Fernández's counsel objected on hearsay grounds, and the district court made the same ruling, i.e., that it could only make a final ruling at the close of the evidence. At the close of the government's case, neither the Defendants nor the government requested a final ruling from the court on the admissibility of any of the provisionally admitted co-conspirator testimony under Fed. R. Evid. 801(d)(2)(E), and the court did not make one.

Under <u>Petrozziello</u>, the out-of-court declaration of an alleged coconspirator may be admitted into evidence under Fed. R. Evid. 801(d)(2)(E) if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was made in furtherance of the conspiracy. <u>United States</u> v. <u>Castellini</u>, 392 F.3d 35, 50 (1st Cir. 2004) (citing <u>Petrozziello</u>, 548 F.2d at 23). The trial court is not required to decide what has come to be called in this Circuit the <u>Petrozziello</u> question prior to admitting the statement,

but may admit it provisionally subject to making a final determination at the close of all the evidence. <u>United States v. Ortiz</u>, 966 F.2d 707, 715 (1st Cir. 1992).[21] We ordinarily review such determinations for clear error, but where, as here, the defendant fails to request a final <u>Petriozziello</u> ruling prior to verdict, this Court will vacate the defendant's convictions on this ground only upon a showing of plain error. <u>Avilés-Colón</u>, 536 F.3d at 14 ("Our precedent clearly establishes that to preserve a hearsay objection to the admission of a co-conspirator's statement, the objection must be renewed at the close of all of the evidence."); <u>see</u> <u>also</u> <u>United States</u> v. <u>Perez-Ruiz</u>, 353 F.3d 1, 12 (1st Cir. 2003); <u>Ortiz</u>, 966 F.2d at 715-16.

On appeal, Defendants failed to identify the allegedly hearsay statements on which they base their claim. Absent identification of the challenged statements, "[w]e cannot conduct effective appellate review of . . . evidentiary ruling[s] admitting coconspirator statements under . . . Rule 801(d)(2)(E)." <u>United States v. Isabel</u>, 945 F.2d 1193, 1199 (1st Cir. 1991); <u>see</u> <u>id.</u> (finding waiver where appellants failed to identify the challenged hearsay statements). Without specification of the statements, we

---

[21] If at the close of the evidence the court reverses its provisional ruling, "it may give a cautionary jury instruction or, on motion, declare a mistrial if an instruction would not prevent or cure the prejudice resulting from its provisional admission of the hearsay." <u>United States</u> v. <u>Isabel</u>, 945 F.2d 1193, 1199 n.10 (1st Cir. 1991) (citing <u>United States</u> v. <u>Ciampaglia</u>, 628 F.2d 632, 638 (1st Cir. 1980)).

cannot determine whether they were hearsay, and if so, whether the evidence supported application of the exception for co-conspirator statements in furtherance of the conspiracy.[22]

## IX. Rosario's remaining arguments

Rosario argues pro se and for the first time on appeal that his due process rights were violated because a "selected sworn juror was asleep from the inception of the trial." Rosario Supp. Br. at 8. Rosario cites to a portion of the transcript where Rosario's counsel alerted the trial court that one of the jurors was "falling asleep." At the time, Rosario did not raise any due process objection, and therefore, such argument is at best forfeited on appeal, subject to review only for plain error. The trial court is not required to remove a juror who has slept and is accorded considerable discretion in handling the matter. See, e.g., United States v. Freitag, 230 F.3d 1019, 1023 (7th Cir. 2000); see also United States v. Newman, 982 F.2d 665, 670 (1st Cir. 1992). A sleeping juror does not violate a defendant's due process rights unless the defendant can show he was prejudiced to

---

[22] We note that, as for the statements made by González to García-Heredia concerning plans to kill El-Reyes (to which González objected to below), we would have no trouble concluding that the evidence showed a conspiracy among García-Heredia, González, and Fernández (Rosario was not implicated by this testimony), and that the statements were made in furtherance of the conspiracy. We note further that the statement would also be admissible, at least as to González, as an admission of a party-opponent under Fed. R. Evid. 801(d)(2)(A).

-35-

the extent that he did not receive a fair trial.  See Freitag, 230 F.3d at 1023.  Rosario's pointing out that a single juror at one point in the trial fell asleep does not by itself establish such prejudice, and does not support grant of new trial.

Rosario also argues for the first time on appeal that his trial should have been severed pursuant to Federal Rule of Criminal Procedure 14.  He argues that he was prejudiced by the spillover effects of evidence with respect to González and Fernández's role in the April 25, 2004 murders, in which he had no part.  This argument is forfeited as he failed to raise it below.  In any event, "[c]o-conspirators are customarily tried together absent a strong showing of prejudice."  United States v. Perkins, 926 F.2d 1271, 1280 (1st Cir. 1991).  On the current record, we have no reason to think that had a motion to sever been made, the district court would have been compelled to grant it.  See United States v. Brandon, 17 F.3d 409, 440 (1st Cir. 1994) ("The decision to grant or deny a motion for severance is committed to the sound discretion of the trial court and we will reverse its refusal to sever only upon a finding of manifest abuse of discretion.").[23]

---

[23] After oral argument, González and Fernández submitted various pro se motions, seeking, inter alia, a stay of the proceedings and appointment of new counsel or permission to proceed pro se.  The basis for González and Fernández's motions appear to be that the government breached plea agreements entered into in a prior criminal case, 04-cr-217 (PG), by using evidence from that case in the instant prosecution and that their trial and appellate counsel were ineffective in not pursuing these allegations.  The motions are denied.  González and Fernández's allegations should be raised

**CONCLUSION**

For the reasons stated above, the judgment of the district court is affirmed as to González and Fernández. The judgment as to Rosario is vacated to the extent it is based on the jury's findings beyond a reasonable doubt of elevated drug quantities. Rosario's case is remanded for re-sentencing. Any pending motions are moot.

---

in the first instance in the district court pursuant to 28 U.S.C. § 2255.